# UNITED STATES BANKRUPTCY COURT
## NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

IN THE MATTER OF:              )
                               )
ANGELA M. EZELL,               )       CASE NO. 04 B 41448
                               )
        Debtor                 )

## FINDINGS OF FACT AND CONCLUSIONS OF LAW
## ON U.S. TRUSTEE'S MOTION FOR
## DISGORGEMENT AND SANCTIONS (DOCKET NO. 47)

This case was filed under Chapter 13 of the Bankruptcy Code, Title 11 U.S.C.

The United States Trustee filed a Motion to Compel Debtor's counsel, Timothy K. Liou

("Liou") to disgorge fees received by him and for sanctions. Liou responded to the Motion and

evidentiary hearing was held thereon. The following constitutes Findings of Fact and

Conclusions of Law pursuant to which the Motion will be allowed by separate order.

## INTRODUCTION TO FINDINGS OF FACT

The Debtor previously filed her first Chapter 13 case (No. 03 B 17903). That case was

dismissed pursuant to 11 U.S.C. § 1307(c)(5) on August 13, 2003, after confirmation of her

Chapter 13 Plan was denied. Liou received $173 directly from Debtor in that case. Liou filed an

Application for Compensation seeking $2,700 in legal fees. That application was pending at the

time the case was dismissed; therefore, no order awarding fees was ever entered. The Chapter 13

Trustee made no distributions.

In the present case, on November 9, 2004, (the "Petition Date") Liou did not disclose on

Schedule F any debt owed to him by the Debtor for prior attorneys' fees. Instead, Liou listed a

prepetition debt to Kurt J. Kolar, Esq. ("Kolar"), as "assignee to breach of contract," in the

amount of $2,341.40. Neither the original nor the Amended Statement of Financial Affairs

("SOFA") show any payments made to Liou in the prior bankruptcy case.  Also, at that time,

Debtor filed an application to pay filing fees in installments.

On February 2, 2005, Debtor's Chapter 13 Plan in this case was confirmed.  The Plan

provided for monthly payments of $202 and proposed a 54.97% dividend to general unsecured

creditors.  The Plan only repaid general unsecured debt; there were no home mortgage or other

secured claims.

On January 18, 2005, Liou filed an Application for Compensation seeking total

compensation of $2,908.40 ("Application"), which reflected that Liou received $623 in the prior

case.  On February 2, 2005, Liou's Application was granted and he was awarded compensation.

On May 24, 2006, Liou filed Proof of Claim 5-1 in the amount of $2,625.26 in the name

and on behalf of Kolar, as "assignee to contract" ("Kolar Claim").  The Kolar Claim was filed

well after the claims bar date expired on May 9, 2005, but Liou as attorney for Debtor did not

object to the Kolar Claim. On December 5, 2007, he filed a Motion to Extend Time to File Proof

of Claim, thus seeking to have the Kolar Claim treated as timely filed ("Claim Motion").   On

January 9, 2008, Liou's  Motion was approved.

On March 23, 2010, a discharge order was entered after Debtor completed all Plan

payments.

On June 1, 2010, the Chapter 13 Trustee filed his Final Report, indicating in pertinent

part that $1,663.41 was paid on the Kolar Claim.  Kolar and Liou have since admitted that once

paid to Kolar, the $1,663.41 was actually transferred to and received by Liou.

On June 2, 2010, the Debtor's Chapter 13 case was closed.

2

On February 15, 2012, the U.S. Trustee filed the Motion to Reopen Chapter 13 Case in light of a statement of charges filed by Judges Wedoff and Hollis regarding Liou's actions in two other cases.

The issue presented here turns on the fake Kolar Claim that Liou arranged to be filed and allowed so that Liou could receive payment on that claim through Kolar's turnover of payments he received thereon, and on Liou's explanation as to why he did that.

## DETAILED FINDINGS OF FACT

1. This Chapter 13 case was commenced by the Debtor, Angela M. Ezell ("Ezell" or "Debtor"), with the filing of her voluntary petition on November 9, 2004. (Answer at ¶ 1).

2. Throughout the duration of the case, attorney Timothy K. Liou ("Liou") was Debtor's counsel of record. (*Id.* at ¶ 2).

3. Prior to this case, Debtor had another Chapter 13 bankruptcy case in the Northern District of Illinois, Case No. 03 B 17903 (the "First Case"). (*Id.* at ¶ 3).

4. Liou was Debtor's counsel of record in the First Case. (*Id.* at ¶ 4).

5. In the First Case, Liou filed an Application for Compensation seeking $2,700 in fees; said Application indicated that Liou had received $173 directly from the Debtor. (*Id.* at ¶ 5).

6. On August 13, 2003, the First Case was dismissed. (*Id.* at ¶ 6).

7. Liou's Application for Compensation remained pending at the time the First Case was dismissed, and an order awarding fees was never entered. (*Id.* at ¶ 7).

8. The Chapter 13 Trustee made no disbursements in the First Case. (*Id.* at ¶ 8).

3

9.    Debtor testified that she had no knowledge of filing more than one bankruptcy case. She testified that she believed her only bankruptcy case completed successfully. (Trial Tr., Dec. 10, p. 69, lines 2-17).

10.    In the instant case, complete Schedules and a Statement of Financial Affairs were filed with the Petition on November 9, 2004. (Answer at ¶ 9).

11.    At the time Liou filed the instant case for Debtor, he believed he held a claim against her for attorney's fees from the First Case. (Trial Tr., Dec. 10, p. 105, lines 8-11; p.107, lines 1-11; p. 138, lines 12-14).

12.    On Schedule F filed in the instant case, there was no indication of any debt owed to Liou on account of outstanding attorney's fees from the First Case. (Answer at ¶ 10; Govt. Ex. 1).

Liou disputed this finding of fact, but Schedule F filed in the instant case only indicated that Kurt J. Kolar, Esq. ("Kolar") was a claimant for $2,341.40 as an "assignee to breach of contract." (Govt. Ex. 1). Liou claims that Kolar was his assignee for purposes of processing Liou's claim for the unpaid attorney's fees that he earned in Debtor's prior bankruptcy case (the "Prior Fees"). (Trial Tr., Dec. 10, p. 105, line 12; p. 106, line 8; p. 168, line 16; p.169, line 6).

However, in his Answer, Liou admitted the precise language of Finding No. 12. (*See* Answer, ¶ 10). The Final Pretrial Order [Docket No. 63] provided that "All well pleaded facts admitted in the pleadings are admitted into evidence, unless objections are filed to relevance or prejudice at least 7 calendar days prior to trial." Moreover, the Kolar Claim filed as supposed assignee of the Liou fee claim was phoney, the purported assignment was a mere conduit for

4

Liou to recover the unpaid fees due from the first case and Kolar paid Liou what was paid on the Kolar Claim.

13.     Liou testified and claimed that his claim appears on Schedule F "indirectly ... by way of the claim of Kurt J. Kolar as assignee to breach of contract." (Trial Tr., Dec. 10, p. 105, lines 23-25).

14.     Liou purported to assign his claim against the Debtor to Kurt J. Kolar ("Kolar"), but has no written documentation evidencing the assignment, (Trial Tr., Dec. 10, p. 143, lines 8-24), thus making the purported "assignment" fictional.

15.     Liou, or someone operating at his direction, prepared the Debtor's Schedule F listing Kolar as a creditor. (Govt. Ex. 1, Schedule F, filed Nov. 9, 2004).

16.     Liou now acknowledges that the Schedule F filed in this case was false. (Trial Tr., Dec. 10, p. 29, lines 13; p. 30, line 3).

Liou disputes Finding of Fact No. 16. However, in Liou's counsel's opening statement, he was questioned by the Court and gave a partial answer. Liou personally gave a more complete answer to the question of whether Schedule F filed in this case was "false." He first testified that, "I didn't believe [the schedules] were not truthful." (Trial Tr., Dec. 10. p. 168, lines 12-13). He further testified that, while "[o]ne might think that" Schedule F was, on its face, not truthful, "as a nominal assignment, I believed that this was the custom and practice that the trustee wanted me to use." (*Id.* at p. 169, line 1–6). Liou further testified that he listed Kolar on Schedule F as holding a claim against the Debtor because "I was told my name could not be in the Schedule F, and I'm still told that to this day." (*Id.* at p.170, lines 1-3).

But despite the foregoing evasiveness, Liou's Answer conceded that the Schedule F filed in this case was, "in a literal sense, 'false and erroneous ...'" (Answer, p. 21).

17.    Debtor attested to the accuracy of Schedule F under penalty of perjury. (Answer at ¶ 32).

18.    Neither the original nor amended Statement of Financial Affairs filed in the instant case show any payments made to Liou on account of the First Case. (Answer at ¶ 11).

19.    Accompanying the Petition and Schedules was a Chapter 13 Plan ("Plan") which proposed a 54.97% dividend to general unsecured creditors over a sixty-month term. (*Id.* at ¶ 12).

20.    Debtor did not have a home mortgage or other secured debt; her Plan repaid only general unsecured debt.  Had Debtor proposed a thirty-six month repayment Plan with the same monthly payment provided in the Plan, it would have resulted in a roughly 24% distribution to general unsecured creditors. (*Id.* at ¶ 12, n. 1).

21.    Liou asserts that the Plan proposed a sixty-month term because Debtor had "parking citations totaling $10,340 and that it was [her] desire to have the longest Plan pay off duration possible to keep her driving privileges as long as possible." (*Id.*).

22.    Debtor testified that Liou advised her to propose a sixty-month term for her Plan. (Trial Tr., Dec. 10, p. 53, lines 16-18).

23.    Debtor's Schedule I indicates that she worked two jobs to support herself and her two sons.  Her total monthly household income was $1,946.71 and her total monthly household expenses were $1,744, leaving monthly disposable income of $202.71. (Answer at ¶ 13).

24.    The monthly payment under the Plan was $202. (*Id.* at ¶ 14).

6

25.    The Plan was confirmed on February 2, 2005.  (*Id.* at ¶ 15).

26.    On January 18, 2005, Liou filed his Application for Compensation (the "Application") in the instant case seeking total compensation of $2,908.40.  The Application indicates that Liou received $623 in the First Case. (*Id.* at ¶ 16).

27.    On February 2, 2005, the Court granted the Application and awarded compensation of $2,908.40 to Liou. (*Id.* at ¶ 17).

### The Claim in this Case for Liou's Fees due from the First Case

28.    On May 24, 2006, Proof of Claim 5-1 ("Claim 5-1") was tardily filed with the Court on behalf of Kurt J. Kolar, Esq. (Answer at ¶ 18).

29.    Claim 5-1 recites an amount of $2,625.26 owing to Kolar as "[a]ssignee to contract." (*Id.* at ¶ 19).

30.    Claim 5-1 included $328.26 in late charges, calculated at 9% interest from a principal amount of $2,297. (Govt. Ex. 2, p. 5).

31.    Liou testified that he was entitled to late charges based on the Illinois Interest Act, which provides for interest on judgments. (Trial Tr., Dec. 10, p. 109, lines 9 -12).

32.    Liou acknowledged that he did not hold a judgment against the Debtor, and Liou testified that the imposition of interest on Claim 5-1 was an "administrative mistake." (Trial Tr., Dec. 10, p. 110, lines 4-13).

33.    Notwithstanding the fact that Claim 5-1 was late and exceeded by $283.86 the amount listed as owing Kolar on Schedule F, Debtor, through her counsel, Liou, did not object to the Claim.  (Answer at ¶ 21).

7

34.     Even if Liou were owed fees for the First Case (notwithstanding the fact that an order awarding fees had not been entered) it is not clear what the balance due for those fees would have been on the petition filing date of the instant case.  Liou acknowledged that the documents of record reveal at least four possible figures: $2,077 (the $2,700 sought in the First Case less the $623 disclosed as received for that case in the Fee Application filed in this case); $2,341 (the amount listed on Schedule F); $2,297 (the amount listed as principal in the late charge calculation for Claim 5-1); and $2,625.26 (the amount recited in Claim 5-1). (Trial Tr., Dec. 10, pp. 109-112).

35.     On December 5, 2007, Liou filed a Motion to Extend Time to File Proof of Claim seeking to have Kolar Claim 5-1 treated as timely filed, (Answer at ¶ 22), resulting in Debtor paying the Kolar Claim.

36.     The Motion was granted on January 9, 2008. (*Id.* at ¶ 23).

37.     Debtor made all payments required under the Plan, and on March 23, 2010, a discharge was entered. (*Id.* at ¶ 24).

38.     On June 1, 2010, the Chapter 13 Trustee filed his Final Report and the case was closed the following day. (*Id.* at ¶ 25).

39.     The Final Report indicates Claim 5-1 was the second largest claim filed in the instant case, the largest claim being the $9,830 claim of the City of Chicago for unpaid parking tickets. (Govt. Ex. 6).

40.     The Final Report indicates that allowed claims totaled $13,348.80, and that the total principal disbursed through the Plan on account of such claims was $8,454.70. (*Id.*).

41.     The Final Report indicates that the Chapter 13 Trustee made disbursements to Kolar, who received $1,663.41 on account of Claim 5-1. (Answer at ¶ 26).

42.     Kolar did not retain any portion of the funds received on account of Claim 5-1, and instead remitted all such sums to Liou. (*Id.* at ¶ 27).

## Debtor's Lack of Knowledge of Claim 5-1

43.     Debtor testified that she did not know Kolar. (Trial Tr., Dec. 10, p. 54, lines 12-13).

44.     Debtor testified that she was not told that Kolar would be filing a Proof of Claim in her case. (Trial Tr., Dec. 10, p. 54, lines 14-16).

45.     Debtor testified that she did not know the basis for Kolar's Claim. (Trial Tr., Dec. 10, p. 54, lines 20-22).  In fact she did not owe Kolar anything.

46.     Debtor testified that she was not asked whether she wanted to pay Kolar. (Trial Tr., Dec. 10, p. 55, lines 19-21).

47.     Debtor testified that she did not authorize or request that Liou file the Motion to Extend Time to File Poof of Claim. (Trial Tr., Dec. 10, p. 55, lines 9-13).

48.     Liou did not contact or request permission from Debtor before filing the Motion to Extend Time to File Proof of Claim (Trial Tr., Dec. 10, p. 119, lines 18-20; p. 120, lines 23-25), but her name appeared on the Motion's service list. (Trial Tr., Dec. 10, p. 120, lines 20-22).

49.     Liou testified that he does not know whether he informed Debtor that she had a right to object to his filing a Proof of Claim on behalf of Kolar.  (Trial Tr., Dec. 11, p. 20, lines 18-23).

50.    Liou testified that he does not know whether he told Debtor that his attorney's fees due from the first case were dischargeable and did not have to be paid if a proof of claim for those fees was not filed in the second case. (Trial Tr., Dec. 11, p. 22, lines 25; p. 23, line 8).

Liou disputed Finding of Fact No. 50.

Liou's objection cites his testimony at lines 4-5 ("That would probably have come up by and large") while completely ignoring the follow-up question at lines 6-7 ("You say probably. Did it come up or did it not come up or do you not know?") and his response at line 8 ("I don't know.") (Trial Tr., Dec. 11, p. 23, lines 4-8).

## Absence of Disclosure Regarding Conflicts of Interest

51.    Debtor credibly testified that Liou never discussed any conflict of interest with her, and that if he had, she would have remembered it, as it would have raised a concern in her mind. (Trial Tr., Dec. 10, p. 56, lines 6-14; p. 69, line 20; p. 74, line 13).

52.    Liou testified that he had a conversation with Debtor regarding a conflict of interest, but he does not recall the specific conversation. (Trial Tr., Dec. 10, pp. 132-133).

Liou disputed Finding of Fact No. 52.  He testified to the content of his conversation with Debtor in which he supposedly obtained a conflict waiver.  (Trial. Tr., Dec. 10, p. 134, lines 5-15).  But Liou specifically testified that "I don't recall the specific conversation."  (Trial Tr., Dec. 10, p. 133, line 11).

53.    Liou testified that he always has had the same conversation regarding conflicts of interests with his clients when he asserts a claim in their case under Kolar's name. (Trial Tr., Dec. 10, p. 137, lines 4-10).

54.    Liou testified that he does not know whether he discussed with Debtor the conflict posed by her affirming a Schedule F containing false information. (Trial Tr., Dec. 10, p. 139, line 1).

55.    Liou testified that he did not discuss with Debtor about the calculation of the Kolar Claim amount and the erroneous addition of interest. (Trial Tr., Dec. 10, p. 139, lines 2-12).

56.    Liou testified that in his opinion, a parking ticket debt is not dischargeable through Chapter 13 and that any such debt that is not paid through the Plan will remain owing at the time the discharge is entered. (Trial Tr., Dec. 10, p. 118, lines 15-22).

57.    Liou testified that he does not believe a conflict of interest arose as a result of his receiving funds from the Kolar Claim that would otherwise have gone primarily towards the payment of Debtor's parking ticket debt, a debt that he believed to be non-dischargeable.  He also testified that he does not know whether he advised her that their economic interests diverged. (Trial Tr., Dec. 10, p. 140, lines 5-9).

58.    Liou testified that he likely did not discuss with Debtor the conflict that resulted from his filing the late Kolar Claim and having it allowed, with her interest in maximizing payment on her (what he believed to be) non-dischargeable parking ticket debt. (Trial Tr., Dec. 10, p. 141, line 19; p. 142, line 3).

59.    Irene Rabatine, the Case Administration Manager from Chapter 13 Trustee Tom Vaughn's Office, testified that when a general unsecured claim is filed beyond the bar date, it will not be paid, absent a court order directing otherwise. (Trial Tr., Dec. 10, p. 42, lines 1-16).

60.    Had Claim 5-1 not been treated as timely filed, the allowed general unsecured

claims would have totaled $10,515.14, and $7,708.99 would have been paid to the City of

Chicago on account of the parking ticket debt, instead of $6,229.66. (*See* Govt. Ex. 6).

61.    Debtor's net payments towards the Plan totaled $12,120 over its sixty-month

term. (See *id.*).

62.    Had Debtor proposed a thirty-six month Plan with the same monthly payment of

$202, her payments would have totaled $7,272, some $4,848 less than she paid through the Plan.

### Liou's Assertion of Directions From an Assistant
### Chapter 13 Trustee to Justify use of the Kolar "Assignment"

63.    Liou testified that he began to file claims against his own clients under the name

of another as a result of an instruction from Anthony Olivadoti ("Olivadoti"), an attorney

employed by Chapter 13 Trustee Marilyn Marshall. (Trial Tr., Dec. 10, p. 129, lines 6-13).

64.    Liou acknowledged that Olivadoti did not work for Tom Vaughn, the Chapter 13

Trustee, in the instant case. (Trial Tr., Dec. 10, p. 129, lines 19-21).

65.    Olivadoti credibly testified that more than a decade ago, he represented a Chapter

13 Trustee in cases where Liou filed proofs of claim in his name against his debtor clients. The

Chapter 13 Trustee objected and Liou's claims were disallowed. (Trial Tr., Dec. 11, p. 64, line

20; p. 65 line 5; p. 67, line 6; p. 68, line 4).

66.    Olivadoti credibly testified that he next encountered Liou asserting claims against

his clients under his (Liou's) wife's name, and again, the Chapter 13 Trustee objected and the

claims were disallowed. (Trial Tr., Dec. 11, p. 68, lines 7-11).

12

67.    Olivadoti credibly testified that he never told Liou to file claims under someone else's name and that he, Olivadoti, did not learn that Liou was filing claims under Kolar's name until sometime around February of 2011. (Trial Tr., Dec. 11, p. 68, lines 12-25).

68.    Liou stated in his Answer that it was necessary that he file a proof of claim because his claim was listed on Schedule F (under Kolar's name), and if a proof of claim was not filed, Debtor would suffer an adverse tax consequence for forgiveness of debt; Liou was unable to explain plausibly during his testimony exactly how this consequence would come about (Answer, pp. 11-12; Trial Tr., Dec. 10, pp. 124-128) unless Liou brought it about by reporting a forgiven debt to the IRS.

69.    In addition to the tax ramifications he claims to have perceived, Liou testified that he also filed Claim 5-1 under Kolar's name for "full disclosure" of debt and because Debtor desired that Liou be paid the past due debt. (Trial Tr., Dec. 10, p. 129, lines 1-5).

70.    Liou's proclaimed rationales for his act of filing Claim 5-1 on behalf of Kolar so as to collect his own debt after Kolar was paid are not credible.  It is clear that Liou's primary motive for filing Claim 5-1 was his desire to have it paid without the record showing that the payment was intended for him.

71.    Liou contends that Debtor's memory is unreliable.  The examples argued (and set forth below in Nos. 72 through 79) were consistent with the lack of understanding shown by many Chapter 13 debtors concerning details about their case filings, and did not undermine credibility of Debtor's testimony at trial.

72.    Debtor testified that she recalled filing one case, her First Case, in 2003. (Trial Tr., Dec. 10, p. 57, lines 1-8; *id.* at p. 60, lines 2-5).

13

73.     Debtor had no recollection that her First Case was dismissed.  (Trial Tr., Dec. 10, p. 60, lines 15-17).

74.     Debtor had no recollection of filing a second case (the Current Case) in 2004. (Trial Tr., Dec. 10, p. 69, lines 13-17).

75.     Debtor had no recollection of signing a second set of schedules in the Current Case. (Trial Tr., Dec. 10, p. 69, lines 2-5).

76.     Debtor had no recollection, in connection with either case, of attending any meeting at the Office of the Chapter 13 Trustee, or otherwise involving a representative of the Chapter 13 Trustee's Office. (Trial Tr., Dec. 10, p. 60, line 15; p. 61, line 1)4.

77.     Debtor failed to recall any such meeting, despite being prompted (i) that an officer of the Chapter 13 Trustee and an attorney from Liou's firm would have been present, (ii) that she would have taken an oath to tell the truth in a room with these other people and (iii) that she would have been asked questions about her bankruptcy case. (Trial Tr., Dec. 10, p. 60, line 15; p. 61, line 14).

78.     Debtor was unable to recall (i) the dismissal of the First Case, (ii) filing the Current Case in 2004, (iii) signing two petitions and related schedules, (iv) attending any Section 341 meeting with the Chapter 13 Trustee or (v) the Chapter of the Bankruptcy Code under which she filed the one case she did recall filing.

79.     Debtor also testified that, at the time of her deposition in this case, she believed she had filed a case under Chapter 11 of the Bankruptcy Code. (Trial Tr., Dec. 10, p. 51, line 21- p.52, line 1).

80.     The Current Case successfully concluded with a discharge on March 23, 2010.
(UST Prop. Find. ¶ 37).

81.     Disclosed in Liou's Application for Compensation in the Current Case, filed on
January 18, 2005, Liou received payments totaling $623 in connection with the First Case. (Govt.
Ex. 4 (Fee Application in Current Case showing $623 paid to Liou's firm for First Case); *see
also* UST Prop. Find. ¶ 26).

82.     Liou testified that Debtor was aware that she owed the balance of fees from the
First Case that she wanted to pay them to him and that she was unable to pay them all at once.
(Trial Tr., Dec. 10, p 165, lines 13-23; Trial Tr., Dec. 11, p.18, line 23; p. 19, line 2).  Having
first sought to destroy Debtor's reliability by showing that she could not recall details, this
testimony was a self-serving uncorroborated and not credible statement of what an alert Debtor
supposedly understood from intake procedures at the Liou firm.

83.     Liou testified that clients who come to his law firm with new cases, including
Debtor, want to pay and retain him and his firm again because of his and his law firm's
familiarity with their financial situation and his knowledge of what issues they are facing. (Trial
Tr., Dec. 11, p. 17, lines 6-18).

84.     Liou testified that he also told Debtor that in order to comply with "the
instructions and directives from the Chapter 13 trustee's office," he was going to file the claim
for Prior Fees in Kolar's name and that Kolar was going to turn the money back over to him.
(Trial Tr., Dec. 11, p.19, lines 8-13).  There is no corroboration of this testimony and the Debtor
credibly denied it.

15

85.     Liou testified that, to the extent he did not recall all of the details of the conflict waiver discussion with this particular Debtor, such as exactly where or when they occurred, or the precise wording he used, his routine and habit was to have a conflict waiver discussion with all debtor-clients who owed Prior Fees and desired to pay them through their subsequent cases. (Trial Tr., Dec. 10, p. 154, line 16 – p. 155, line 21).

86.     Debtor testified that she understood that a longer payment plan would reduce the amount of her payments and that she agreed with Liou's advice to enter into a sixty-month plan. (Trial Tr., Dec. 10, p. 90, lines 16-25).

87.     Debtor testified that she was not coerced into filing a Chapter 13 as opposed to a Chapter 7 case, and that it was "[her] final decision" to file a Chapter 13.  (Trial Tr., Dec. 13, p. 85, lines 21-86).

88.     However, Debtor also testified that no one at Liou's office discussed a possible conflict of interest with her, and never discussed the "supposed assignment of claim" procedure involving Kolar.  (Trial Tr., Dec. 10, pp. 70-71).

89.     In or about 1998 or 1999, Liou first began to file second, or subsequent cases ("New Case(s)") on behalf of debtors for whom he had filed a first, or previous case ("Prior Case") that was dismissed (Govt. Ex. 11 (Nov. 14 Tr. at p.60, lines 4-16.)).

90.     When he began filing New Cases, Liou would, on some occasions, schedule himself as a creditor for Prior Fees on Schedule F in the New Cases and file a proof of claim, in his own name, to collect the Prior Fees from the Chapter 13 Trustee in the New Case. (Trial Tr., Dec. 11, p. 67, lines 9-17).

16

91.   Liou then began filing the claims for Prior Fees in his wife's name. (Trial Tr., Dec. 11, p. 68, lines 7-11).

92.   Liou testified that Olivadoti's response to this practice was that Olivadoti "threw up his hands and asked 'can't you find anybody else.'" (Govt. Ex's 10, 11, 12; Apr. 4 Tr. at 40; Nov. 14 Tr. at 61; Feb. 7, 2012 Tr. at 30).

93.   Olivadoti testified that in his actual discussions with Liou that took place in or about the year 2000, "I told him that if he was in any way connected, that we would object to the claim because it's improper." (Trial Tr., Dec. 11, p. 80, lines 21-24).

94.   Liou has created out of what Olivadoti told him a contention that Olivadoti told him that he could file Prior Fee claims, but not in his name. (Trial Tr., Dec. 11, p. 129, lines 11-15).

95.   Liou supposed understanding, based on his version of conversations with Olivadoti, was that the purpose of Olivadoti's advice was to avoid only the appearance of impropriety created by having his name appear as connected with claims for Prior Fees, (Govt. Ex. 10; Apr. 4 Tr. at p. 40, lines 1-7), whereas in fact Olivadoti was objecting to his actual connection with and interest in such claims when he was a debtor's lawyer.

96.   Liou claims that he did not and still does not believe there was an actual conflict created by his filing claims for Prior Fees in his clients' New Cases. (Govt. Exs 10, 11, 12; Apr. 4 Tr. at 40; Nov. 14 Tr. at 62; Feb. 7, 2012 Tr. at 31).

97.   Liou also did not and does not believe that making a motion to allow the late-filing of Kolar's Proof of Claim for his Prior Fees presented a new conflict of interest, requiring a further client's waiver. (Trial Tr., Dec. 10, p. 171, lines 3-13).

98.    Liou's understanding was that once Debtor understood how he was going to

proceed, expressed a desire to pay him and orally waived any conflict that might exist as a result

of his asserting a claim for Prior Fees, no further waiver discussion was required. *(Id.)*

99.    Liou acknowledges now that he was required to list claims for Prior Fees as debts

on debtors' Schedule Fs. (Trial Tr., Dec. 10, p.124, lines 13-15). This understanding was

confirmed by order of Judge Wedoff in March of 2011. (Govt. Ex. 8; Mar. 10 Tr. at 8).

101.    Liou testified that he believed the legal concept underlying a "nominal

assignment" was that one can assign a right or interest "by name only," while "the assignor is

still holding . . . the benefit, I guess you would call it." Trial Tr., Dec. 10, p. 158, lines 8-15.

102.    Liou's office filed the Prior Fee claims in this case using his own ECF (electronic

filing system) user name and password. (Trial Tr., Dec. 11, p. 51, lines 3-16). This is the same

procedure he used in all cases where he filed, in Kolar's name, proofs of claim for Prior Fees.

(Govt. Exs.11, 12; Nov. 14 Tr. at 67; Feb. 7, 2012 Tr. at 50).

103.    Liou himself signed a proof of claim (in his own name) for a Prior Fee Claim in

the case of *In re Cedeno*, even though that same form listed Kolar as the claimant. (Govt. Exs.

11, 12; Nov. 14 Tr. at 66; Feb. 7, 2012 Tr. at 46-47).

104.    Liou's own legal staff member Ms. Patel "openly" contacted the Chapter 13

Trustee to inquire about the status of payment on a Prior Fee Claim that had been filed in Kolar's

name. (Trial Tr., Dec. 11 p.87, line 15; p. 88, line 12; Resp. Ex. 1 (the "November 2007 E-

mail")).

105.    Olivadoti testified that, at the time of the November 2007 E-mail, he knew that

Ms. Patel worked for Liou and he understood that she was inquiring for the purpose of obtaining

18

payment on a proof of claim filed in the name of Kolar. (Trial Tr., Dec. 11, p.87, line 15; p. 88, line 12; Resp. Ex. 1).

106.   Kolar endorsed the Trustee's checks issued as payment for Prior Fees directly to Liou who then countersigned them and delivered them to his bank, with the full knowledge that they would be presented for payment to the Trustee's bank with both Kolar's and Liou's signatures as endorsements on the back. (Trial Tr., Dec. 10, p. 123, line 18 – p. 124, line 5; *see also* Govt. Exs.11, 12; Nov. 14 Tr. at 66- 67; Feb. 7, 2012 Tr. at 49-50).

107.   Liou testified that this was the procedure used until sometime in or about 2006 when banks stopped accepting "third-party" checks. (Trial Tr., Dec. 10, page 123, lines 23-25).

108.   As in this case, Liou sometimes filed late claims in other cases for Prior Fees claims, which necessitated a motion to validate the late filing. (Govt. Ex. 5).

109.   Liou testified that filing claims for Prior Fees late requires a judge to sign an order allowing the late-filed claim. It thereby "puts it under a spotlight" and created significantly more work and attention to the claim. (Trial Tr., Dec. 10, p. 166, line 23; p. 167, line 25). (The implication of this argument is that if there was anything wrong, the Chapter 13 Trustee, Judge or Debtor should have caught it.)

110.   In total, over nearly a twelve (12) year period, Liou has collected approximately $8,300 in payments from Chapter 13 Trustees with respect to the "nominally-assigned" claims. (Trial Tr., Dec. 10, p.172, lines 7-10).

111.   Liou acknowledged that his addition of late charges to the Prior Fees due in this case was unwarranted, given that an order awarding attorney's fees for the Prior Case has never been entered. (Trial Tr., Dec. 10, p. 110, lines 8-10).

112.     Liou belief in the non-dischargeability of parking and/or traffic violations was based on his interaction with City of Chicago offices, discussions with other bankruptcy attorneys about this issue, post-discharge feedback from debtors including the Debtor in this case, and his reading of Section 523(a)(7) of the Bankruptcy Code.  (Trial Tr., Dec. 10, p.54, lines 2-6; Declaration of Timothy K. Liou dated March 5, 2013, Case No. 12-MP-90002).

113.     Liou testified that he regrets that he did not exercise better judgment and foresight in adopting the assignment procedure for partial recovery of his Prior Fees. (Trial Tr., Dec. 10, p. 172, line 14 – p. 172, line 3).  Despite asserting lack of motivation to deceive, he acknowledges not providing adequate disclosure to ensure that a judge or trustee, unaware of the procedure he believed to be appropriate, would in fact not be deceived by the Kolar assignment documents. *(Id.)*

## CONCLUSIONS OF LAW

### Jurisdiction and Venue

The Court has authority to adjudicate the U.S. Trustee's Motion pursuant to 28 U.S.C. §§ 157 and 1334.  This matter is a core proceeding under 11 U.S.C. §157(b)(2)(A).

### I. Liou Violated Applicable Conflict of Interest Rules

The Rules of Professional Conduct for the United States District Court for the Northern District of Illinois apply in all bankruptcy proceedings before this Court. N.D. Ill. Bankr. L.R. 9029-4 (2003) (renumbered 9029-4A effective January 1, 2012).

Between September 1, 1999 and June 1, 2011, Local Rule 83.51.7 of the United States District Court for the Northern District of Illinois provided, in pertinent part:

20

(b) A lawyer shall not represent a client if the representation of that client may be materially limited… by the lawyer's own interests, unless:

> (1) the lawyer reasonably believes the representation will not be adversely affected; and

> (2) the client consents after disclosure.

N.D. Ill. L.R. 83.51.7(b) (2000).  Written client consent is not required by that Rule.

"Disclosure" is a defined term under the Rules, meaning "communication of information reasonably sufficient to permit the client to appreciate the significance of the matter in question." N.D. Ill. L.R. 83.50.2(4) (2000).

The first issue here is whether filing of the supposed Kolar Claim, which was actually to recover unpaid fees allegedly due Liou arising from work in the prior Chapter 13 case, violated any rules of professional conduct.  As more fully discussed below, Liou had an actual conflict of interest with the Debtor by reason of the claim for fees he held against her.  Under Local Rule 83.50 of the Rules of Professional Conduct for the U.S. District Court, Northern District of Illinois, the applicable disciplinary rues are the ABA Model Rules.  ABA Model Rule 1.7 ("Rule 1.7") addresses conflicts of interest regarding current clients.

Rule 1.7(a), with certain exceptions, prohibits a lawyer from representing a client if the representation involves a concurrent conflict of interest.  Under Rule 1.7(a)(2), a concurrent conflict of interest exists if there is a significant  risk that the representation will be materially limited by a personal interest of the lawyer.  Clearly, at the time of the filing of Debtor's second Chapter 13 case, as a creditor, Liou had a personal interest at conflict with Debtor because he sought to collect a prior fee debt from the Debtor through facilitating a phony claim by Kolar against his client, the Debtor, so as to arrange for collecting his fee.  The issue under Rule 1.7 is

whether Liou's interest in receiving payment for representation in the prior bankruptcy case

materially limited his representation in the second case.

Liou's argument relies on the Illinois Rules of Professional Conduct ("IRPC") Rule 1.7.

He argues that, other than where a Chapter 13 plan promises to pay creditors 100% (which

Debtor did not file here), the addition of Liou's claim for prior fees would not add anything to the

amount a debtor ultimately pays to complete the plan.

Liou denies that he had an actual conflict of interest with Debtor or that he affirmatively

concealed any actual conflict of interest. Liou argues that Kolar was scheduled as an "assignee,"

consistent with Kolar's role as a "nominal  assignee," which Liou says he believed to be a lawful

arrangement. Liou has asserted here that this supposed assignment was authorized by a deputy

Chapter 13 Trustee to avoid the appearance of impropriety for claim processing purposes, but

that assertion was false. The Chapter 13 Trustee representative credibly denied suggesting to

Liou that he should use assignments of his fee claims as a way of handling his own claims for

prior fees. Rather, the representative credibly testified he told Liou that if Liou was in any way

connected to a claim by another, the Chapter 13 Trustee would object to the claim.

The practice of Liou in this case was part of a long pattern of similar practices. Liou

claims that he did not condition his continued representation of repeat debtors upon the payment

of fees for prior cases, but that debtors "appreciated his representation" and "wanted to pay the

balance." Liou contends that he would have represented the debtors whether or not

they paid the prior case fees prior to filing the current case. Liou claims that he asked debtors to

"pay whatever they're able."

Liou also contends that he obtained an informal oral, but not written, conflict waiver from Debtor. Liou states that he had lengthy waiver conversations, which included a discussion as to what generally is a conflict of interest and the specific potential conflict between him and Debtor. We only have Liou's testimony as to his procedure and the supposed oral waiver; no record was kept and Debtor denied there was any such conversation.

Liou testified that in this case, Debtor chose to proceed under Chapter 13 because she had substantial overdue parking citations exceeding $10,000, and in order to keep her driver's license valid, she was required to make payments toward those citations.

*In re Gutierrez,* 309 B.R. 488 (Bankr. W.D. Tex. 2004) was relied on by Liou for the proposition that there is value in having the same attorney represent a debtor in successive bankruptcy filings and a claim for prior case fees does not necessarily create an adverse interest. In that Texas case, the attorney filed his own claim for prior case fees in his own name. *Id.* at 490. The *Gutierrez* Opinion stated that a claim for prior case fees doesn't create a *per se* materially adverse interest to debtor client except in two circumstances; First where an attorney fails to apprise the debtor of the availability, if appropriate, of proceeding under Chapter 7, because of the attorney's desire to obtain payment of his claim; and second where debtor's attorney acting in the interests of the client would be unlikely to object to a claim held by the attorney. *Id.* at 497-98. From the debtor's point of view, the total payments required under a plan are usually the same with or without the attorney's claim, although the payout to other creditors would be higher without such claim. *Id.*

In this case, Liou testified that he advised Debtor of the conflict and all her options, including filing a Chapter 7, and that Debtor gave her oral informed consent and made her

23

informed decision to pursue the second Chapter 13 case with Liou's help as counsel.  Debtor

denies all that and there is no record corroborating the story that Debtor gave such consent or that

she would have been unlikely to object had she known of the conflict.

Liou's reliance on *In re Gutierrez*, 309 B.R. 488 (Bankr. W.D. Tex. 2004) for the

proposition that conflicts of interest were not present in this case is misplaced. *Gutierrez*

involved a claim that was asserted openly; counsel in that case did not cause his client to file a

false Schedule F.  Moreover, it did not appear that payment of counsel's general unsecured claim

in that case diverted payments that would have otherwise gone to pay (what Debtor's counsel in

this case said he believed to be) non-dischargeable debts. Furthermore, there is no indication in

*Gutierrez* that counsel advised debtor to propose a plan for a longer term (and larger total

payment) than was otherwise necessary.  Finally, the debtor in *Gutierrez* was aware of the

assertion of his lawyer's claim.

Liou also cites *In re Holland,* 374 B.R. 409 (Bankr. D. Mass. 2007) for the proposition

that there is no inherent conflict where the attorney for a Chapter 13 debtor applied for

compensation and reimbursement in connection with debtor's current and a prior case. In that

case, the attorney did not file a proof of claim for prior case fees.  *Id.* at 433. The *Holland*

Opinion acknowledged that the attorney was a creditor at commencement of the pending case

and, if attorney had filed a claim, that claim would have been deemed allowed in the absence of

an objection.  *Id.*  Nevertheless, the Opinion  was satisfied, based on representations made by the

U.S. Trustee in that case that any conflict of interest between debtor's counsel and debtor was

subsequently waived by debtor. *Id.*

24

In this case, Liou's personal interest in collecting his fee balance in the prior bankruptcy case created the likelihood that his representation of Debtor in the second bankruptcy case would be and was actually materially limited by requiring payment of a fake claim that once paid went to debtor's lawyer. Liou's improbable testimony that he obtained Debtor's informed waiver of such conflict was contradicted by Debtor's testimony.

At the outset of Liou's representation of Debtor in this instant case, Liou's interests were in direct conflict with Debtor's interests in at least three material respects: (1) to pursue the collection of his claim, Liou prepared a false Schedule F for the Debtor; (2) Liou improperly calculated his claim and added interest to it without any legal basis; and (3) it was in Debtor's economic interest to propose the least burdensome plan possible, while it was in Liou's economic interest to propose a plan providing that he would be paid the old fee balance due him though the device of the Kolar Claim being filed.

The very nature of these conflicts was such that Liou could not have "reasonably believed" it possible to provide disinterested, and competent counsel to his client. Moreover, even if these conflicts were susceptible to waiver, no credible evidence was presented to establish that an effective waiver was obtained. To the contrary, Debtor credibly testified that Liou never even discussed a conflict of interest with her.

In addition, contrary to Liou's assertions in his Answer and testimony, Debtor's parking citations were subject to discharge through Chapter 13.[1]

---

[1] As fines or penalties payable to a governmental unit, parking tickets are within 11 U.S.C. § 523(a)(7). *In re Gallagher*, 71 B.R. 138 (Bankr. N.D. Ill. 1987). While debts within § 523(a)(7) are not dischargeable under § 727, they are dischargeable under § 1328(a)

The fact that Debtor's parking ticket debt was subject to discharge illustrates the fundamental flaw in Liou's justification for advising her to propose a sixty-month plan, *i.e.*, that it would enable her to hold her driving privileges free from suspensions for the longest time possible. In fact, with the same $202 monthly payment, Debtor could have proposed a thirty-six month plan providing a roughly 24% distribution to general unsecured creditors, and her parking tickets would have been discharged upon its successful completion. While a thirty-six month plan would have saved Debtor approximately $4,848, it would also have materially reduced the amount Liou was able to collect on account of the Kolar Claim that was filed on Liou's behalf. So he filed the longer Plan which had the result of Debtor paying more to him.

As shown in the foregoing discussion, Liou acted while conflicted by his personal interests contrary to his client's interests.

### Liou Breached Fiduciary Duties Owed to Debtor

As counsel to Debtor, Liou was a fiduciary. *In re Winthrop,* 219 Ill.2d 526, 848 N.E.2d 961, 972 (2006) ("The attorney-client relationship constitutes a fiduciary relationship as a matter of law."). "When, in the course of his professional dealings with a client, an attorney places personal interests above the interests of the client, the attorney is in breach of his fiduciary duty by reason of the conflict." *Doe v. Roe,* 289 Ill. App. 3d 116, 681 N.E.2d 640, 645 (1997). Liou acted on the above conflicts in furtherance of his own interests and thereby violated the fiduciary duties of good faith and loyalty owed to Debtor, his client.

26

### Liou Practiced a Fraud on the Court

By causing Claim 5-1 to be filed under the name of Kolar and omitting himself from

Schedule F, Liou affirmatively and intentionally concealed his status as a creditor while

attempting to collect payment on account of his old fee claim.

The filing of Claim 5-1 induced the Chapter 13 Trustee to disburse funds. The Trustee's

reliance on the claim was reasonable, and actual damages to Debtor and the bankruptcy system

have resulted.

By causing his client to file a claims schedule under oath that included the fake Kolar

Claim, Liou also committed a fraud on the Court.

### II. Cancellation of Fee Agreement and Disgorgement of All Compensation are Warranted Under 11 U.S.C. § 329

The second issue is whether Liou's fee agreement should be canceled and all

compensation paid in this case as a fee and paid on the Kolar Claim for fees for Liou's work on

the 2004 case be ordered disgorged under 11 U.S.C. § 329. Section 329 provides that, to the

extent an attorney representing a debtor receives compensation that exceeds the reasonable value

of services rendered, the court can cancel the attorney-client fee agreement and order the fees

disgorged to the extent they are excessive. The value of Liou's services were not reasonable in

this case because of the conflicts of interest with Debtor. Liou affirmatively concealed this

actual conflict by filing his claim in the name of Kolar, although Kolar held no interest in and

actually kept nothing he was paid from the claim payments. Liou prepared the Schedule F

falsely listing Kolar as a creditor, a document which Liou knew Debtor would be required to

attest to under penalty of perjury, which Debtor did by signing the petition. These actions,

showed that Liou's services in this case were of limited value to Debtor.

The U.S Trustee relies in part on *Woods v. City Nat'l Bank & Trust Co.,* in which the

Supreme Court noted that "reasonable compensation for services rendered' necessarily implies

loyal and disinterested service in the interest of those for whom the claimant purported to act."

312 U.S. 262 (1941) (citing, *American United Mut. Life Ins. Co. v. Avon Park,* 311 U.S. 138

(1940) (when a claimant is "subject to conflicting interests, he should be denied compensation.

It is no answer to say that fraud or unfairness were not shown to have resulted.")). That case was

decided under the Chandler Act, a predecessor to the Bankruptcy Code, but the principle

remains applicable. However, the usual basis today for challenging attorneys' fees paid or due is

under 11 U.S.C. §§ 329 and 330. *See also In re Wiredyne, Inc.,* 3 F.3d 1125, 1127 (7th Cir.

1993) ("[I]n order to challenge the attorneys' fees paid, or owed, for services performed prior to

the order for relief, one must rely on section 329 of the Code.")

Under 11 U.S.C. § 329(b), the court can cancel an attorney-client fee agreement and

order the fees disgorged to the extent that compensation received exceeds the reasonable value

of services rendered. In making such determination, the court is to be guided by 11 U.S.C.

§ 330 that sets forth a number of factors that Congress found relevant to an assessment of the

value of the services. *In re Wiredyne, Inc.,* 3 F.3d 1125, 1127 (7th Cir. 1993). That section

provides that reasonable compensation for an attorney's services depends on

> . . . the nature, the extent, and the value of such services, taking into account all
> relevant factors, including -
> (A) the time spent on such services;
> (B) the rates charged for such services;

(C) whether the services were necessary to the administration of, or beneficial at the time at which the service was rendered toward the completion of, a case under this title;

(D) whether the services were performed within a reasonable amount of time commensurate with the complexity, importance, and nature of the problem, issue, or task addressed ...

(F) whether the compensation is reasonable based on the customary compensation charged by comparably skilled practitioners in cases other than cases under this title.

11 U.S.C. § 330(a)(3).

The U.S. Trustee has not made any specific contentions as to why he believes the compensation approved by the Court in this case is unreasonable, other than the conflict of interest regarding the claim for fees in the prior case discussed above and Liou's actions to conceal his claim. He does not argue that the time spent was excessive, that the rates charged were out of line, that the services performed were not necessary, or for any other reason listed in § 330. Indeed, the Court's original approval of Liou's Fee Application herein, the lack of an objection by the Chapter 13 Trustee at the time of such approval, and Debtor's successful completion of Plan payments and discharge of debts are all argued by Liou to support his contention that the usual compensation requested was reasonable and that services provided by Liou were valuable to Debtor.

However, a Seventh Circuit opinion has noted that "[t]he existence of a conflict of interest is certainly a relevant factor in the analysis [under § 330] and is a justifiable reason to reduce or require disgorgement of attorneys' fees.... " *In re Wiredyne*, 3 F.3d 1125, 1127 (7th Cir. 1993).

The deceptive claim used as Liou's way of collecting fees due in a prior case added to the totality of fees collected in this case. In that sense, the total compensation Liou received exceeded

the reasonable value of services rendered in the second bankruptcy case, which would require

disgorgement under Code § 329 of the additional amount thereby collected.

Moreover, considering the unnecessary length of the Chapter 13 Plan approved and

additional monies paid by Debtor on the over-long plan, and considering also the false and

deceptive practices by Liou, his entire fee paid in this case is also tainted.

The U.S. Trustee's Motion in this case is brought pursuant to 11 U.S.C. §§ 105 and 329.

The UST argues that the following sanctions are warranted to be imposed upon Liou for his

actions in this case:  (1) disgorgement to Debtor of the $2,700 he received in compensation for

the instant case; (2) disgorgement to Debtor of the $1,663.41 he improperly collected through

Claim 5-1, and (3) a $10,000 fine payable to the Clerk of Court for benefit of the United States

whose attorneys from the U.S. Trustee's office prosecuted this proceeding.

Liou knowingly caused Debtor to file a false Schedule F in the instant case. His conflicts

of interest with Debtor, and the material breach of fiduciary duties he owed to Debtor, compel

not less than total disgorgement of both the $2,700 he received in compensation for the instant

case and the $1663.41 received through the bogus Claim 5-1.

However, disgorgement of fees is not sufficient to sanction Liou for his conduct; more is

required.

### III. <u>Imposition of Sanction Under 11 U.S.C. § 105(a)</u>

Apart from disgorgement, pursuant to inherent powers under 11 U.S.C. § 105(a), the

Court should impose sanctions on Liou for failing to disclose his status as a creditor and

affirmatively hiding that status by filing a fake Kolar Claim that was really Liou's  claim.

Liou affirmatively concealed his status as a creditor through a pretended but undocumented assignment of his claim to Kolar and filing a claim in Kolar's name even though the payment to Kolar on the claim was to go to Liou. Thus, Liou perpetrated a fraud on the Court, Trustee, Creditors, Debtor and the bankruptcy system as a whole. While Liou's bad faith filing of a petition with Schedule F omitting his name as a creditor could be viewed as violating Federal Rule of Bankruptcy Procedure Rule 9011, the totality of the acts involved in Liou's deceptive scheme are appropriately redressed through sanctions emanating from 11 U.S.C. § 105 and the Court's inherent powers. *In re Volpert,* 110 F.3d 494, 500 (7th Cir. 1997) "[T]he plain language of §105 furnishes the bankruptcy courts with ample authority to sanction conduct that abuses the judicial process...") *See also In re Rainbow Magazine,* 77 F.3d 278 (9th Cir. 1996) ("By providing [in § 105] that bankruptcy courts could issue orders necessary 'to prevent an abuse of process,' Congress impliedly recognized that bankruptcy courts have the inherent power to sanction that *Chambers* [501 U.S. 32 (1991)] recognized exists within Article III courts.") and *In re Courtesy Inns, Ltd.,* 40 F.3d 1084, 1089 (10th Cir. 1994) holding that (11 U .S.C. § 105 is "intended to imbue the bankruptcy courts with the inherent power [to sanction] recognized by the Supreme Court in *Chambers* [501 U.S. 32 (1991)]").

Certain aspects of Liou's bad faith actions are capable of redress through specific rules, but the totality of the acts involved in Liou's fraudulent scheme are appropriately redressed only through sanctions emanating from 11 U.S.C. § 105 and the Court's inherent powers. *In re Volpert*, 110 F.3d 494, 501 (7th Cir. 1997); *In re Rainbow Magazine*, 77 F.3d 278 (9th Cir. 1996) (*In re Courtesy Inns*, 40 F.3d 1084, 1089 (10th Cir. 1994).

31

Liou argues that the evidence shows an absence of intentional wrongdoing and therefore sanctions are inappropriate citing *In re CMGT, Inc.,* 458 B.R. 473, 492 (Bankr. N.D. Ill. 2011) (Squires, J.)  In that case, the Bankruptcy Judge stated that despite the open-ended language of § 105(a), courts must exercise caution to limit the circumstances under which the statute is used. *Id.*  However, "[s]anctions are justified under § 105(a) where the sanctioning court has clearly found that a litigant intentionally abused the judicial process in an unreasonable and vexatious manner." *Id.* (quoting *In re Collins,* 250 B.R. 645, 657 (Bankr. N.D. Ill. 2000)).

Liou also argues that he did not intentionally omit such fee receipt and was not trying to conceal such payment.  He compares his situation to that of the attorney in *In re Gage,* 394 B.R. 184, 193-95 (Bankr. N.D. Ill. 2008). In that case, the Bankruptcy Judge found the attorney engaged in a pattern of filing false Rule 2016(b) Statements, but did not find corroborating evidence to show his conduct was intended to defraud. *Id.* at 195. However, the attorney in that case refunded all fees ($4,057) received from the debtor, plus an additional $500 for the time the trustee expended in the matter, and also reached settlement with the trustee on other cases. *Id.* at 193.

Liou also denies any intent to deceive in using the "nominal assignment" to Kolar of the fee due to him to file a claim in this case for the remaining fee balance from the prior case.  Liou states that his office filed the claims using his CM/ECF (electronic filing system) user name and password, often had open contact with the Chapter 13 Trustee's office to inquire about the status of payment of such claims, and endorsed the Chapter 13 Trustee's checks. Liou admits that "after [Liou's] bank stopped accepting double-endorsed checks, Kolar (an attorney) began depositing

32

the Trustee's checks in his client funds account and writing checks to [Liou] in the same amount."

Liou also claims he had a "good faith belief" that the Chapter 13 Trustee only desired this method as a means of avoiding the appearance of a conflict, but that [such "nominal" assignment] was the least problematic solution to a dilemma created by the requirement of scheduling claims and the possible tax complications of simply 'erasing' the debt." Liou cited *Aquila, LLC v. City of Bangor,* 640 F. Supp. 2d 92 (D. Me. 2009) for the proposition that the use of nominal assignments for purposes of litigation is not unusual. In that case, the defendant moved for summary judgment after the plaintiff's insurer paid plaintiff for loses on claim because the plaintiff was not the "real party in interest" for purposes of prosecuting the case. *Id.* at 99. The Opinion in *Aquila* saw an effective ratification under Fed. R. Civ. P. Rule 17 of an Assignment by the insurer to plaintiff of its right to seek recovery for policy benefits and expressly acknowledged that the plaintiff had the right to sue in the insurer's name. *Id.* at 101. In the Assignment, the plaintiff agreed to pay the insurer the amount recovered less attorney's fees and costs to prevent multiple suits and to accord appropriate *res judicata* effect to litigation. *Id.* However, that case has no relevance here because the insurer in *Aquila* had subrogation rights and the assignment was made to comply with "real party in interest" requirement pursuant to Fed. R. Civ. Proc. 17(a). Moreover, there was a documented assignment, not a fictional transaction.

Finally, Liou states that he no longer uses assignments of claims for prior attorney's' fees and that he now exercises increased oversight of petition schedule and statement filings. He also states that he limits any payments he accepts from debtors within the preference period to an amount which, by law, does not constitute an avoidable preference." Liou contends that over a

33

nine year period, he has collected only $8,308.84 in payments from the Chapter 13 Trustees with

respect to "nominally-assigned" claims. He implies that he should be given a pass here because

he was successful in collecting "only $8,308.84" through the false claims that he arranged in this

and other cases.

Liou asserts that his intent was to avoid the "appearance of impropriety created by having

his name connected with claims for prior fees" by assigning the claim to a third party for the sole

purpose of collecting on such claim in someone else's name. He is blind to the actual

impropriety of that activity, and unrepentant.

Therefore, Liou will also be ordered to pay a sanction of $10,000 to the Clerk of Court

on behalf of the United States in recognition of the time consuming and work required herein by

Assistants to the United States Trustee.

## REPLY TO LEGAL ARGUMENT ADVANCED IN LIOU'S RESPONSE

Some further comment is warrant on final arguments filed by Liou.

His Response is mistaken in its assertion that the Illinois Rules of Professional Conduct

govern this matter. Local Rule 83.51.7 of the United States District Court for the Northern

District of Illinois, in effect between September 1, 1999 and June 1, 2011, is applicable to Liou's

conduct in this matter. *See* N.D. Ill. Bankr. L.R. 9029-4 (2003) (renumbered 9029-4A effective

January 1, 2012). This error, so late in this case and Liou's career shows a serious lack of

knowledge about his ethical obligations.

Liou's continued insistence that there was no conflict between him and Debtor is a further

demonstration of the need for material sanction. Liou was one of the Debtor's creditor's (albeit

concealed) and at the same time her attorney. The Kolar Claim was phoney, yet, despite his

34

explicit obligation to Debtor under their Model Retention Fee Agreement (Govt. Ex. 1, p. 6,

¶ 12) to "object to invalid or improper claims," Liou contends that he had no conflict of interest.

Liou believed that Debtor's largest debt, some $10,340 attributable to parking tickets was not

dischargeable. Yet, he professes to see no conflict in the assertion of Kolar's time-barred claim

made for Liou's benefit, which was in fact an invalid claim, that diverted significant payments

from other creditors. Liou similarly sees nothing improper about his filing of a motion to treat

the fake Kolar Claim as timely filed, or in his completion of a materially false schedule F. Liou's

claim for payment through the spurious Kolar Claim was premised on fees never awarded in the

first case, it included significant interest charges claimed without legal basis, was erroneously

calculated resulting in further inflation, listed Kolar on the schedule in place of himself as

creditor, and he caused the Debtor to file the false schedule under penalty of perjury. The several

conflicts of interest, and the breaches of fiduciary duties that resulted when the conflicts were

acted upon, were reprehensible.

While Liou asserts that there was no conflict, he contends that if there were a conflict it

was cured by the Debtor's consent. The Debtor credibly denied such consent. The record is

clear – there was no consent, much less informed consent. Liou's testimony to the contrary was

not credible.

Liou contends that he did not intend to deceive anyone with the filing of his fraudulent

claim, and that "this type of assignment … has precedent in other areas of the law." (Response,

p. 28, ¶ 17). The Response's authority for this proposition is an anonymously authored, two

paragraph posting on an internet website, www.uslegal.com, which itself cites to the unreported

decision of *O&G Industries v. LaFarge Bldg. Materials, Inc.*, 2009 Conn. Super. LEXIS 2494

(Conn. Super. Ct. Sept. 16, 2009) (discussing the doctrine of assignment for collection under

Connecticut law). The *O&G Industries* decision denied a motion to dismiss premised on lack of

standing where the document assigning the relevant claims to plaintiff was attached to the

complaint. In that case there was no concealed assignment as purportedly existed in this case.

The other decisions cited in the Response, *Kennedy v. Deere & Co.*, 142 Ill. App. 3d 781, 492

N.E.2d 199 (Ill. App. Ct. 3d Dist. 1986) and *Westville v. Loitz Bros. Constr. Co.*, 165 Ill. App. 3d

338, 519 N.E.2d 37 (Ill. App. Ct. 4th Dist. 1988), involved actual documented assignments of

rights to payment, not imagined or "nominal" assignments. More to the point, none of those

decisions involved bankruptcy cases or ethical duties.

The Response's final pleaded attempt to convince the Court that sanctions are not

warranted is without merit. Liou's conduct in this case was egregious. His contention that he did

not breach the fiduciary duties owed to his client is arrogant and unrepentant. He demonstrates

an unwillingness or inability to appreciate the seriousness of his actions. His assertion of the

defense of laches, for the first time in the Response and without any support in law or in the

evidentiary record, is factually and legally infirm.

## CONCLUSION

> "0 what a tangled web we weave.
> When others we practice to deceive."
> -Anon.

Liou deserves sanction for his intentional abuse of the judicial process by requiring him

to disgorge all monies received through use of the fake Kolar Claim and for fees paid in this case.

Liou testified that it was not his intent to deceive the Court in this case or in the other

similar cases by listing his claim for prior case fees in Kolar's name, even though his office filed

36

the Kolar Claim and endorsed to Liou some checks paid on the claim. Rather, he claims he had a

good faith belief that he needed to file the claims in the name of a nominee to "avoid the

appearance of impropriety" and for procedural reasons based on purported discussions with a

representative of the Chapter 13 Trustee.  However, that representative credibly denied Liou's

version of their discussion, and testified that he told Liou that "if he was in any way connected,

that we would object to the claim because it's improper."  So, Liou knew that the Chapter 13

Trustee would have objected to the claim for the prior case fees if he filed the claim in his own

name. Liou's attempt to cast the burden of his wrongdoing on the Chapter 13 Trustee's

representative only magnified his wrongdoing and shows that he did not act in good faith at all.

Liou's  response to the warning of that representative was to go through the motions of

finding a "nominee," filing a fake claim in the nominee's name, and couching the basis for the

claim as "assignee to breach of contract."  The monies collected on the claim were paid over to

Liou.  As a result, he was still connected to the claim, which the Chapter 13 representative

warned him was viewed as improper.

Liou's actions in Debtor's case were reprehensible. When even a single financially

vulnerable client is preyed on by an unethical attorney as was the Debtor in this case, it is one too

many.  Liou's deceptive conduct was admittedly repeated by him in a number of cases over

several years.  Serious sanctions, including complete disgorgement of all fees collected in this

case and of the amount collected from Debtor on the phony Kolar Claim, plus a material fine of

$10,000 payable to the Clerk of Court, and referral of these Findings and Conclusions to the

Illinois Attorney Registration Commission with a request to impose on Liou a course of

37

education on related ethical subjects are all warranted.  The United States Trustee will present on

a scheduled date a Judgment Order so providing.

ENTER:

_____

Jack B. Schmetterer
United States Bankruptcy Judge

Dated this ____ day of August 2013.